UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOSE MARIA ALVES DECASTRO, et al.,                :

                              Plaintiffs,          :          12cv1386 (AT) (DF)

              -against-                            :          **REPORT AND**
                                                              **RECOMMENDATION**
DEEPAK KAVADIA, et al.,                            :

                              Defendants.          :
-------------------------------------------------------------X

**TO THE HONORABLE ANALISA TORRES, U.S.D.J.:**

    Before this Court is the motion of plaintiffs Jose Maria Alves DeCastro and

DJJ-Mining & Services (Private) Limited (collectively, "Plaintiffs") for sanctions against

defendants Deepak Kavadia ("Kavadia") and Nice Gems, Inc. ("Nice Gems") (collectively,

"Defendants") for failure to comply with this Court's discovery Order, dated December 2, 2014

(Dkt. 119 (the "December 2 Order")).  (Dkt. 150.)

    The December 2 Order reviewed at length, and resolved, long-standing discovery

disputes between the parties.[1]  The history of these disputes can be summarized as follows:

Plaintiffs sought production of documents relevant to their claims and to Defendants'

counterclaims.  Defendants' responsive production was meager, and defendant Kavadia (the

principal of defendant Nice Gems) maintained that further documentation either did not exist or

could not be produced because it was outside of his control.[2]  Armed with information

_____

    [1] The December 2 Order also awarded Plaintiffs certain fees and costs associated with
their having moved to compel the production of discovery by Defendants.  (*See infra* at n.2.)
The amount of those fees and costs has been set by this Court in a separate Order of today's date.
(*See* Dkt. 183.)

    [2] Although Defendants have generally made joint submissions in this action, the only
sworn statements that they have put forward with respect to the availability of documents for

suggesting otherwise, Plaintiffs sought intervention from this Court.  This Court found Kavadia's

various reasons for non-production to be suspect – reasons that, as a whole, were inconsistent

and implausible – and therefore sought both clarification of his statements and supporting

documentation.  Defendants responded to some of this Court's requests, but not to others; in any

event, Defendants' submissions did not clarify matters, but further muddied the waters.

Plaintiffs then moved to compel further production.[3]

In the December 2 Order, resolving Plaintiffs' motions to compel, this Court found

"Kavadia's explanations for non-disclosure to be shifting, poorly supported, and of questionable

credibility."  (Dec. 2 Order, at 19.)  As a result, this Court issued several directives, including

ordering Kavadia to make an additional search and further production of emails from his email

accounts.  Given Kavadia's questionable representations that his emails were inaccessible due to

some combination of computer viruses, computer reformatting, and email hacking, this Court

also ordered that, if Kavadia continued to maintain that responsive emails were unrecoverable,

then he should retain a forensic expert to examine both his personal computer and his email

accounts, and to provide a report to this Court.  In addition, this Court ordered Kavadia to

produce several documents relating to an Indian company, Pratik Diamonds (Private) Limited

---

production have been made by defendant Kavadia, apparently speaking both on his own behalf
and on behalf of defendant Nice Gems, Inc.  (*See, e.g.*, Dkts. 106-10, 116-1.)

[3] As detailed in the December 2 Order, Plaintiffs actually filed three separate motions to
compel.  The first, filed on August 28, 2013 (Dkt. 75), was denied by this Court without
prejudice to renewal (Dkt. 78), as, shortly after it was filed, Plaintiffs' then-counsel sought leave
to withdraw from representing Plaintiffs in this action.  After new counsel appeared in the case
for Plaintiffs, Plaintiffs eventually renewed their motion to compel on April 15, 2014 (Dkt. 103),
and the Court denied that motion in part (again without prejudice to renewal), and deferred ruling
in part, pending receipt of further submissions from the parties.  Plaintiffs then filed a third
motion to compel on June 10, 2014 (Dkt. 111), providing additional submissions and renewing
the previously denied portion of their April 15 motion.  The Court's December 2, 2014 Order
addressed the April 15 and June 10 motions.

("Pratik Diamonds"), of which Kavadia was reportedly both the majority shareholder and a director.

Kavadia did not comply with any of these directives, even after the deadline was extended at the request of Andrew Lavoot Bluestone, Esq. ("Bluestone"), Defendants' counsel. Plaintiffs then requested permission to move for sanctions.  (Dkt. 136.)  During a telephonic pre-motion conference held by this Court on January 15, 2015, Bluestone maintained that additional emails were unrecoverable (neglecting, however, to provide the report of a forensic examiner regarding Kavadia's laptop computer and email accounts), and asserted that additional Pratik Diamonds records either did not exist or were outside of Kavadia's control.  Subsequently, at the Court's insistence, Bluestone finally filed reports of a computer forensic expert with respect to the examination of Kavadia's laptop computer and email accounts.  One of these reports revealed that a *document destruction program* called "Eraser" had been installed and run on Kavadia's personal laptop computer while the parties were engaged in discovery disputes, and, indeed, that the program had been installed on the day after Plaintiffs first sought leave to file a motion to compel.

Plaintiffs have now proceeded to move for sanctions.  Before addressing that motion, this Court held an evidentiary hearing on March 9, 2015, in order to take Kavadia's testimony and evaluate his credibility regarding Defendants' various proffered reasons for failing to produce documents.  Having considered the parties' several submissions, as well as Kavadia's testimony, as discussed further below, this Court has determined, as a matter of fact, that Kavadia has engaged in the spoliation and willful non-production of evidence.  Accordingly, I recommend

that the jury be given an adverse inference instruction and that Plaintiffs be awarded the reasonable attorney's fees and costs they incurred in moving for sanctions.[4]

## BACKGROUND

The parties' claims in this action center on three sets or parcels of diamonds. Plaintiffs claim that they delivered the first parcel to Defendants, who agreed to sell the diamonds to a third party under a profit-sharing agreement, but that Defendants never sold or returned the diamonds. Plaintiffs also claim that they supplied a set of 14 colored diamonds to Defendants – under an agreement that Defendants would have them cut, polished, and certified by a professional in the United States, and then return them to Plaintiffs – but that Defendants also failed to return those diamonds. Separately, in a counterclaim, Defendants assert that they paid Plaintiffs $384,000 as an investment in a third parcel of diamonds, but that Plaintiffs failed to procure or deliver that parcel. Plaintiffs concede that they did not deliver the parcel to Defendants, but allege that they returned the funds paid by Defendants by wiring the funds, at Kavadia's request, to a bank account in India held by Pratik Diamonds.

### A.      Kavadia's Emails

During the discovery process, one of the main points of contention among the parties has related to Kavadia's continued failure to produce emails responsive to Plaintiffs' discovery demands. In particular, it has long appeared that Kavadia has had control over at least three email accounts – dkftp@yahoo.com, dkftp11@gmail.com, and nicejewels1@gmail.com – from which he has failed to produce emails that likely existed. (*See* Dec. 2 Order, at 6-11.) Although

---

[4] Even though, pursuant to 28 U.S.C. § 636(b), this Court would have the authority to award attorney's fees and costs as a discovery sanction (and, in fact, has done so with respect to Plaintiffs' request for the fees it incurred in connection with their earlier motions to compel discovery (*see* Dkt. 183; *see also supra* at n.1)), this Court has opted to address the entirety of Plaintiffs' sanctions motion by way of a report and recommendation, given that, in their current motion, Plaintiffs have requested "litigation-ending sanctions," thus rendering the motion potentially dispositive of both their claims and Defendants' counterclaims in this case.

Kavadia produced a handful of emails in response to Plaintiffs' document demands, Plaintiffs

noted that they had themselves produced additional emails sent to or from Kavadia's accounts,

but that Kavadia had failed to produce copies of those same emails; from this, Plaintiffs argued

that Kavadia had plainly withheld responsive documents.  (*See* Declaration of Matthew J. Harris,

Esq. ("Harris"), in Support of Plaintiffs' Motion To Compel Discovery, dated Apr. 11, 2015 [sic,

2014] ("Harris Apr. 2014 Decl.") (Dkt. 108), at ¶¶ 19-20 & Ex. I.)  Over time, Kavadia – and

Bluestone on his behalf – have made numerous representations to the Court regarding this issue,

as set out below.

> **1.     Representations by Kavadia and Bluestone Regarding Kavadia's
>          Emails, Leading up to the Court's December 2, 2014 Order_____**

Kavadia and Bluestone, on Kavadia's behalf, have each made several inconsistent and

confusing representations in response to Plaintiffs' contentions that Kavadia has failed to

produce responsive emails, first attributing the discrepancy between Plaintiffs' production and

Kavadia's own production to computer viruses that supposedly damaged Kavadia's laptop

computer.  Then, when the Court inquired at a discovery conference as to why Kavadia could not

simply access his Gmail and Yahoo! accounts from another computer, Kavadia and Bluestone

additionally stated that the email accounts themselves had been "hacked," which supposedly

rendered all of Kavadia's emails inaccessible.

Initially, in a May 6, 2014 submission made in opposition to Plaintiffs' motion to compel,

Bluestone attached two versions of what purported to be a July 1, 2013 response by Kavadia to

Plaintiffs' document demands.  (Dkts. 106-6, 106-9.)  Although the two versions were

substantively different, Bluestone attached the same sworn signature page to both.  (*See* Dec. 2

Order, at 5 n.5.)  In what appeared to be the original response, to which the signature page

appeared to correspond (Dkt. 106-6), Kavadia said absolutely nothing regarding any

unrecoverable emails, stating that all responsive emails were enclosed (*id.* ¶ 3).  Kavadia also stated that the email address nicejewels1@gmail.com "[did] not belong to Defendants," but, in any event, was "no longer open."  (*Id.* ¶¶ 2, 4.)  In what appeared to be the later, modified version, however (Dkt. 106-9), which seemed not to have been executed, Kavadia purportedly stated that, since his dealings with plaintiff DeCastro, his laptop had twice been infected with a computer virus (*see id.* at 1).  He further purportedly stated that he kept "no significant documents" on the laptop, that he therefore reformatted the laptop when it became infected, and, that, "as a result," it did not have "any responsive documents," including emails, stored on it. (*Id.*)[5]

As part of the same May 6, 2014 opposition to Plaintiffs' motion to compel, Bluestone also attached an affidavit from Kavadia, apparently prepared by Bluestone[6] and sworn to by Kavadia on May 2, 2014.  (Affidavit of Kavadia, sworn to May 2, 2014 ("Kavadia May 2014 Aff.") (Dkt. 106-10).)  In this affidavit, Kavadia conceded that dkftp@yahoo.com and dkftp11@gmail.com were, in fact, his email addresses (although he continued to maintain that nicejewels1@gmail.com was not his), and stated that he had produced all responsive documents, and that "[a]ll documents and e-mails that [he had were] to be found on [his] laptop, and exist[ed] nowhere else."  (*Id.* ¶ 4.)

---

[5] At the later sanctions hearing, this Court sought clarification from both Bluestone and Kavadia as to when the second, seemingly unsworn version of Kavadia's statement was drafted and how it came to be submitted to the Court, but, as both denied any recollection, this Court directed Bluestone to review his files and inform the Court of his findings.  (*See* Transcript of Evidentiary Hearing, held Mar. 9, 2015 ("Hrg. Tr.") (Dkt. 175), at 33:4-34:15, 37:3-23, 39:8-15.) Bluestone's post-hearing submission does not address when or why the document was drafted, stating only that "[a]pparently[,] two different versions of the same affidavit became interposed," and that "it [was] unknown" how he came to submit both.  (Letter to the Court from Bluestone, dated Mar. 18, 2015 ("Bluestone Mar. 2015 Ltr.") (Dkt. 166), at 2.)

[6] At sanctions hearing, both Kavadia and Bluestone confirmed that Bluestone generally prepared Kavadia's affidavits.  (*See* Hrg. Tr., at 31:16-20, 34:21-23.)

At a May 20, 2014 conference, this Court expressed skepticism that any corruption of Kavadia's laptop would have prevented him from accessing his email accounts from another computer.[7]  After this conference, Bluestone wrote the Court on June 3, 2014, this time stating that Kavadia had "been told that the accounts were hacked" and had "determined" that the accounts did not contain "any" stored, recoverable emails.  (Letter to the Court from Bluestone, dated June 3, 2014 ("Bluestone June 2014 Ltr.") (Dkt.  109).)  Bluestone further represented that Kavadia had "instituted a search and recovery request" to both Gmail and Yahoo! and had been informed by Yahoo! that "he should expect a 4-6 week interval prior to [a] response."  (*Id.*)

About a month later, in response to Plaintiffs' subsequent motion to compel (*see* n.3, *supra*), Bluestone submitted a second affidavit from Kavadia, in which Kavadia variously stated under oath that he "*believe[d]* that [his] e-mail accounts [had been] hacked or otherwise damaged" (Affidavit of Kavadia, sworn to July 6, 2014 (Dkt. 116-1), at ¶ 3 (emphasis added)); that he "had *determined* that [his] e-mail accounts ha[d] been hacked, most likely during [his] travel abroad" (*id.* ¶ 5 (emphasis added)); that, "[a]s a result of this hacking, and as a result of frequent virus attacks and crashes of [his] laptop computer, . . . [he had] no further emails to provide" (*id.*); that his accounts did not have "any *relevant* e-mails saved" (*id.* ¶ 3 (emphasis added)); and that he "[did] not have *any* e-mails (other than those provided) on any of [his] email accounts" (*id.* ¶ 5 (emphasis added)).  Kavadia also stated in this affidavit that he had "asked both Gmail and Yahoo[!] to fix [his] accounts and to provide any e-mails that they [had] in storage."  (*Id.*)  Contrary to Bluestone's earlier representation about the response that Kavadia

---

[7] This Court also directed Kavadia to clarify his relationship to nicejewels1@gmail.com, given the fact that Plaintiffs had produced an email from that account that appeared to have been sent by Kavadia (as well as other emails listing Kavadia as the president of Nice Jewels, Inc.), and that Kavadia had stated that the account was "no longer open."  To date, Kavadia has not provided any such clarification.

had supposedly received from Yahoo!, Kavadia stated that "[n]either [email provider] ha[d] yet finished with [its] response, which [he was] told takes 6-9 weeks."  (*Id*.)

Finally, unpersuaded by the "vague and shifting nature" of Kavadia's explanations for his failure to produce responsive emails, this Court, in its December 2 Order, directed Kavadia to complete an additional search for responsive emails, directly supervised by counsel, for all emails responsive to Plaintiffs' document demands.  (Dec. 2 Order, at 7, 10.)  This Court also directed that, if Kavadia continued to maintain that he could not recover and produce responsive emails, then he submit to the Court (1) copies of all communications with Gmail and Yahoo! regarding Kavadia's requests for recovery of his emails, and (2) an affidavit from a person with technical knowledge, describing, *inter alia*, the extent to which emails could be retrieved from the three email accounts, and, to the extent any emails had been destroyed "by any corruption to either Kavadia's computer or his email accounts," the likely reason for the problem and when it occurred.  (*Id.* at 11.)

### 2.     Kavadia's Failure To Produce Either the Emails or the Forensic Report Required by the December 2 Order

Kavadia did not comply with the directives set out in this Court's December 2 Order. Instead, on December 29, 2015, Kavadia, through Bluestone, merely requested that this Court issue a subpoena to Google and Yahoo!  (Letter to the Court from Bluestone, dated Dec. 29, 2014 (Dkt. 131).)  Kavadia accompanied this request with the affidavit of David S. Capelli ("Capelli"), a Certified Forensic Consultant and Certified Computer Examiner with "over [25] years of information technology experience," indicating (1) that Kavadia "ha[d] at least three web-based email accounts that either were previously in use or [were then] currently in use"; (2) that, as Kavadia could not recover previously deleted emails from these accounts, a court order would likely be required for either Google or Yahoo! to restore deleted emails; and (3) that, even

with a court order, restoration might not be possible.[8]  (Affidavit of David S. Capelli, sworn to Dec. 23, 2014 (Dkt. 131-1), at ¶¶ 3, 9.)

During the pre-motion conference held on January 15, 2015 (following Plaintiffs' request for leave to move for sanctions), Bluestone confirmed, however, that neither he nor Capelli had attempted *any* search of Kavadia's email accounts before requesting a subpoena, and this Court therefore denied the request.  In addition, Bluestone confirmed that, while Capelli had searched Kavadia's laptop itself for responsive emails, he had not examined the laptop for any of the "corruption" claimed by Kavadia.  This Court stated, on the record, that Kavadia was not in compliance with the December 2 Order in multiple respects, as he had failed to complete an additional search, supervised by counsel, of his email accounts; he had failed to obtain a forensic examination of his laptop computer; and he had failed to file the prior purported correspondence with Gmail [*i.e*., Google] and Yahoo!  As a result, this Court warned that Kavadia – and Bluestone, as counsel – were at serious risk of sanctions.

Later that day, Bluestone filed a report by Capelli, dated December 22, 2014, stating that Capelli had examined Kavadia's laptop for emails sent from dkftp@yahoo.com, dkftp11@gmail.com, and nicejewels1@gmail.com, and had extracted files corresponding to each account.  (Confidential Report of Examination, dated Dec. 22, 2014 (Dkt. 140), at 2.)  Bluestone also filed correspondence regarding Kavadia's purported requests to Google and Yahoo! for restoration of emails (Dkt. 141), which Bluestone later filed again, with some supplementation, after this Court questioned its sufficiency (s*ee* Bluestone Mar. 2015 Ltr. and attachments (Dkt. 166-1); *see also* Hrg. Tr. 52:18-56:17).  For the most part, this documentation is not what Bluestone represented it to be, and demonstrates, at best, that Kavadia made a single request for

---

[8] Capelli's affidavit refers to "plaintiff," rather than Kavadia or Defendants, but this appears to be an error, and no party suggests otherwise.

recovery of emails to Google.  In this regard, Bluestone did provide a copy of an email that

Kavadia sent to Google, on May 20, 2014, requesting that certain deleted emails be restored.

(Dkt. 166-1, at 1.)  There is no indication, though, as to whether Kavadia received any response.

Further, Bluestone did not submit *any* communication by Kavadia with Yahoo! regarding the

restoration of emails.  Although Bluestone presented what he *described* as an email from

Kavadia to Yahoo! requesting the restoration of emails, and a responsive Yahoo! Customer Care

letter (*see* Bluestone Mar. 2015 Ltr.), the purported "email from [Kavadia] to [Y]ahoo[!]" is, on

its face, an email from Kavadia to *Bluestone*, and indicates, at most, that Kavadia mailed a

request for recovery of emails to Yahoo! at an address in Sunnyvale, California, although even

this is not entirely clear.[9]  (*See* Dkt. 166-1, at 2.)  In addition, the document that Bluestone

characterized as the "responsive Yahoo[!] Customer Care letter" states that it is an automated

response to an inquiry regarding lost Yahoo! Messenger 11 conversation history, not emails.

(*See* Dkt. 166-1, at 3.)  As with Kavadia's request to Google, there is no indication as to whether

a substantive response from Yahoo! was ever received.  Nothing in Defendants' written

submissions document either what Bluestone told the Court on June 3, 2014 (*i.e.*, that Kavadia

had been informed by Yahoo! that he should expect a four to six week interval for a response to

his request for the restoration of emails) or what Kavadia represented in his July 6, 2014 affidavit

(*i.e.*, that he had been told that responses by both providers would take six to nine weeks).[10]

---

[9] Bluestone also submitted an email from Kavadia to Bluestone, dated May 30, 2014, indicating that he had sent emails to the Gmail and Yahoo! legal teams, that one of these emails had "bounce[d] back," and that he "tried to send them again and send them a letter also." (Dkt. 166-1, at 5.)  With the exception of the email to Google (mentioned above) none of the correspondence referred to by Kavadia is included in Bluestone's submission.

[10] Kavadia's failure to present correspondence with Yahoo! regarding emails is particularly troubling given that Bluestone previously represented to this Court that he had seen Yahoo!'s initial response to Kavadia's request for restoration of emails, and that the initial response stated that a substantive response would take four to six weeks.  (*See* Bluestone June

### 3.      The Forensic Report that Kavadia Finally Filed

Ultimately, on February 13, 2015, Kavadia filed forensic examiner Capelli's report as to the results of his inspection of Kavadia's laptop computer.[11]   (*See* Confidential Report of Examination, dated Feb. 8, 2015 ("Capelli Report") (Dkt. 158-1).)  Capelli's report revealed that the "Eraser" program had been installed on Kavadia's laptop on July 26, 2013 (*id.* at 3) – *one day after* this Court first granted Plaintiffs permission to move to compel the further production of Kavadia's emails and other documents (*see* Minute Entry of discovery conference held on July 25, 2013; Order, dated July 29, 2013 (Dkt. 73)).  Capelli's report also indicated that the "Eraser" program had been used subsequent to its initial installation, with it last being executed on August 19, 2013.  (Capelli Report, at 4.)

Capelli described "Eraser" as a "destructive program," and noted that, as with "[m]ost programs that permanently remove files and folders from a computer," the "Eraser" program did not "keep log files of the specific files" that had been deleted from Kavadia's laptop.  (*Id.* at 3-4.)  In fact, it would appear that the *sole purpose* of the "Eraser" program, which is freely available on the Internet, is to target and delete specific files, as identified by the user, and to remove all traces of the deleted information.  *See* Eraser Home Page, *http://eraser.heidi.ie/* (last visited

---

2014 Ltr.)  Bluestone has since stated that, in his June 2014 letter, he was referring to the automated response regarding Yahoo! Messenger 11 conversation history (*see* Bluestone Mar. 2015 Ltr., at 1 ("[t]his is the responsive Yahoo Customer Care letter that I noted in my letter to the Court, and which the Court has asked about")), although, as just discussed, this automated response does not appear to pertain emails, nor does it state that a response would take four to six weeks (Dkt. 166-1, at 3).

[11] The report was filed by Alan P. Fraade, Esq. ("Fraade"), of Mintz & Fraade, P.C., who entered an appearance as co-counsel for Defendants on January 14, 2015.  (*See* Notice of Appearance (Dkt. 139).)  With Capelli's report, Fraade also filed a letter from Capelli stating that no emails could be recovered from nicejewels1@gmail.com because, when attempting to recover the password for that email address, a message was displayed stating the account had been "deleted and [was] no longer recoverable."  (Letter to Fraade from Capelli, undated (Dkt. 158-2).)

May 5, 2015) ("Eraser . . . allows you to completely remove sensitive data from your hard drive by overwriting it several times with carefully selected patterns," as "[b]efore the file is overwritten, anyone can easily retrieve it with a disk maintenance or an undelete utility").

Finally, despite Kavadia's claims of viruses, crashing, and hacking, Capelli noted that, with the exception of the "Eraser" program, "there [did] not appear to be any suspicious programs installed on [Kavadia's laptop] that would warrant 'corruption' of emails or access from a third party."  (Capelli Report, at 5.)

### 4.    Kavadia's Testimony Regarding His Emails, at the Evidentiary Hearing Held Before This Court

At the evidentiary hearing held by this Court on March 9, 2015, Kavadia testified that he did not install or run "Eraser," that he was unfamiliar with the program, and that he "kn[e]w nothing about [it]."  (Hrg. Tr. 46:1-4, 47:11-24.)  In response to questioning as to how "Eraser" came to be installed on his personal laptop computer, Kavadia testified that the program must have been installed by a person providing him with technical support.  On this point, he testified that, when his laptop computer malfunctioned, approximately two to three times each year, he obtained technical support from an online company (whose representatives could control the computer remotely when he requested assistance), and that he would sometimes take his laptop computer to a Staples store for repair.  (*Id.* at 46:20-47:24.)  Although, at the hearing, this Court invited Kavadia to submit any records that might support his claim that his laptop computer had been accessed by someone other than himself in July and August 2013 (*id.* at 71:3-8), he has not done so.

Kavadia also testified that he never intentionally deleted emails or other documents in connection with the instant action (*id.* at 14:16-14:19), continuing to maintain that responsive

emails were deleted from his email accounts as a result of hacking or computer viruses.[12]  He testified that, when he received Plaintiffs' document demands, he carefully searched his email accounts, each of which contained "more than [200] or 300" emails dating back to at least 2011 (contrary to his prior assertions that his accounts had no emails stored), and that he had provided all responsive emails to his attorney.  (*Id.* at 74:11-75:20.)  He further testified that, although he may have deleted some responsive emails after reading them prior to the initiation of this action (*id.* at 83:15-19), he still believed that both hacking and computer viruses had caused his inability to produce additional responsive documents (*id.* at 49:2-10).

### 5.     This Court's Factual Findings Regarding Kavadia's Emails

Having reviewed all of the parties' submissions throughout the course of their discovery disputes, and taking into account Kavadia's testimony at the sanctions hearing, this Court finds that, during the pendency of this action, with knowledge of his discovery obligations, Kavadia installed and used the "Eraser" program to target and delete specific, relevant files that were stored on his laptop computer, and that, in an attempt to conceal his actions, he made a series of false and misleading statements to this Court.  Despite Kavadia's claims of viruses and file corruption, Capelli's report – which was filed only after Kavadia initially failed to comply with the December 2 Order – reveals *no* file corruption or access by a third party.  Instead, the report reveals that, the day after a discovery conference before this Court, a program designed to enable users to delete all traces of specific files was installed on Kavadia's laptop.  Kavadia's testimony that he knows nothing about this program or how it came to be installed on his laptop computer

---

[12] At the hearing, Bluestone attempted to advance a theory that all responsive emails had been produced by Kavadia and that no responsive emails had been deleted.  (Hrg. Tr. at 85:7-86:21.)  Such a theory does not account for the responsive emails produced by Plaintiffs that were not produced by Defendants, which formed the basis for Plaintiffs' motion to compel; this theory also runs contrary to Kavadia's own testimony at the hearing, and to his and Bluestone's prior representations to this Court.

was not credible, and his speculation that a technical support person must have installed it is implausible and wholly unsupported.  This Court is therefore persuaded that Kavadia installed the program himself and used it to destroy documents, including copies of relevant and responsive email communications that he had stored on his laptop.

In addition, this Court finds wholly incredible Kavadia's assertion that a hacker rendered it impossible for him to access responsive emails from each of his email accounts.  Although the record remains unclear as to when the nicejewels1@gmail.com account was "deleted," as reported by Capelli (*see supra* at n.11), this Court finds that, at a minimum, Kavadia deleted relevant emails from his dkftp@yahoo.com and dkftp11@gmail.com accounts after he knew that such emails were being requested in discovery in this action.  To the extent that any relevant and responsive emails were not produced from these two accounts, and cannot now be accessed, this Court finds that Kavadia intentionally and willfully took steps to destroy those emails, so as to avoid their disclosure.[13]

### B.    Pratik Diamonds Documents

In discovery, Plaintiffs also demanded that Defendants produce Pratik Diamonds' bank account statements (as Plaintiffs contend, in defense of Defendants' counterclaim, that they wired funds to a Pratik Diamonds account at Kavadia's request), as well as Pratik Diamonds' internal communications relevant to this action (as Kavadia, in an email, stated that he "[had] asked [his] [I]ndia office" to obtain an offer on one of the parcels of diamonds at issue in this case (*see* Ex. F to Harris Apr. 2014 Decl. (Dkt. 108-6), at 1)).  Although Defendants initially

---

[13] Although, from the report that Capelli finally provided, it now appears clear that neither Kavadia nor a forensic examiner can retrieve additional emails, no party has renewed the request, initially made by Bluestone, for the issuance of Court-ordered subpoenas to Google and Yahoo!  Based on the record that has been developed, the service of discovery or trial subpoenas on these email providers may now be warranted.

produced one Pratik Diamonds account statement, for a single account and a single month, they

maintained that Pratik Diamonds then refused to provide more, and Kavadia represented that he,

personally, had no control over those bank statements and no ability to access any of Pratik

Diamonds' communications.  As with his emails, Kavadia, Bluestone, and now Fraade, have,

over time, made several representations to the Court on this subject, and, as discussed below,

those representations have been inconsistent, evasive, and generally lacking in credibility.

      1.      **Representations by Kavadia and Pratik Diamonds,**
**Leading Up to the Court's December 2 Order_____**

      With respect to the question of his personal control over Pratik Diamonds documents,

Kavadia initially represented that he had *never* been an owner or officer of Pratik Diamonds, and

that he had never served as an "actual director," although he had been a "nominal director" since

at least July 20, 2011.  (Response to a Request for Admissions, dated Mar. 19, 2013

(Dkt. 108-10), at ¶¶ 2, 5, 8, 10.)  In addition, Kavadia, through Bluestone, presented two letters

to this Court, from attorneys purportedly representing Pratik Diamonds, giving different reasons

as to why the company was unwilling to provide additional documents to Kavadia.  In the first,

attorney Pinakin B. Amin ("Amin") stated that Pratik Diamonds had refused to provide

additional documents because there was no privity of contract between the company and any of

the parties to the current action.  (Letter to Bluestone from Amin, dated May 15, 2013 (Dkt. 70,

at 3-4).)  In another, attorney Mayur V. Faria ("Faria") stated, without providing supporting

documentation, that Kavadia had been a "managing director" of Pratik Diamonds until 2010, but

that the company had since "parted its ways" with Kavadia and had "forfeited [his] voting

rights."  (*See* Letter to Kavadia from Faria, dated July 1, 2014 (Dkt. 116-2), at ¶ 2.)[14]

_____

[14] In this letter, Faria also make several statements distancing Pratik Diamonds from
Kavadia and the present action, including that Pratik Diamonds has "never dealt with" Plaintiffs

Plaintiffs, however, presented documents to the Court, including then-current, publicly available government records of India, listing Kavadia as the majority shareholder and as one of two directors of Pratik Diamonds.  (*See* Plaintiffs' Declaration in Reply to Defendants' Response in Opposition to Plaintiffs' Motion to Compel Discovery, dated July 19, 2014 (Dkt. 117), Ex. B (Dkt. 117-2).)  Based on this evidence, this Court ruled, in its December 2 Order, that "Plaintiffs [had] overcome Kavadia's denial that he ha[d] control" over Pratik Diamonds records.  (Dec. 2 Order, at 17; *see Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 147 (S.D.N.Y. 1997).)  This Court therefore ordered Kavadia to produce any of Pratik Diamonds' communications that were relevant to Plaintiffs' claims or Defendants' counterclaims.  Further, based on a document obtained by Plaintiffs through a subpoena to their U.S. bank, which appeared to show a wire transfer to a Pratik Diamonds account at a bank in India, this Court directed Kavadia to produce a bank statement for the month of July 2011 for a Pratik Diamonds bank account ending in 2276 at Union Bank of India (the account into which, Plaintiffs claimed, the funds they allegedly wired to Defendants were deposited).

### 2.    Kavadia's Failure To Produce the Pratik Diamonds Documents Required by the December 2 Order

Kavadia produced neither the Pratik Diamonds bank statement nor the Pratik Diamonds communications that were the subject of the December 2 Order.  Instead, after the Court's issuance of that Order, Kavadia, through Bluestone, supplied a letter dated December 18, 2014, on Pratik Diamonds letterhead, addressed to the senior manager of the "MSM Branch" of Union

---

(*id.* ¶ 6), that Pratik Diamonds "is not liable for [Kavadia's] acts" (*id.* ¶ 8), and that Pratik Diamonds may only be sued in India (*id.* ¶ 9).

"has never dealt with [plaintiff DeCastro] in terms of diamonds," that DeCastro is "ultimately trying to extort substantial amount through [Pratik Diamonds] by illegally framing the Company into some ongoing suit" in the United States,

Bank of India, requesting the statement for the month of July 2011 for a Pratik Diamonds account ending in 2276.  (Dkt. 136-1.)  This letter bears what appears to be a Union Bank stamp and contains a handwritten notation, reading "[w]e have not any a/c no. which is above mention in our record [sic]."  (*Id.*)  Given that the subpoenaed bank records obtained by Plaintiffs suggested otherwise, or alternatively suggested that the wired funds may have been deposited into an account with a different number, at a different branch of the Union Bank of India, this Court, during the January 15 telephone conference, then directed Bluestone to consult with Kavadia to obtain clarification, including whether Pratik Diamonds had *any* account at the "MSM" or any other Union Bank branch, and to report the account numbers.  The Court received no submission from Bluestone indicating whether he and Kavadia had ever complied with this directive.  Instead, on February 5, 2015, Bluestone filed another letter, this time on the letterhead of the Union Bank of India, "Mumbia Samachar Marg Branch" – that is, apparently the *same* branch as had purportedly responded in the first letter – addressed to Pratik Diamonds and indicating that there was "no such account number ending with 2276 in our branch from july-2011."  (Dkt. 156-3.)

At the same time, Kavadia also provided another letter from Faria giving a different – but similarly cryptic – account of Kavadia's relationship to Pratik Diamonds than the account Faria had provided earlier.  This time, Faria stated that, as of the date of the letter, Kavadia was a shareholder in Pratik Diamonds, but that he had been "discharged . . . from [his] role of Non-Working Director" in 2010; that Pratik Diamonds was "in [the] process" of buying back his shares; and that "it seem[ed] that [Kavadia had] for a considerable period not exercised any of [his] rights" in the company.  (Letter to Kavadia from Faria, dated Feb. 5, 2015 (Dkt. 156-2), at

¶¶ 4-5.)  Neither Kavadia nor Faria have provided any documents supporting or clarifying these assertions.

### 3.    Kavadia's Hearing Testimony and Post-Hearing Submissions Regarding His Relationship to Pratik Diamonds

In contrast to his prior statements, Kavadia testified at the hearing before this Court that he had resigned as Pratik Diamonds' director, and that, although he had provided a written letter of resignation to the company, he did not have a copy.  (Hrg. Tr. at 13:23-14:10.)  He also testified that Pratik Diamonds had "forfeited [his] shares" in 2008 or 2009 (*id.* at 16:18-24, 17:19-25), but that he had not sought clarification as to whether his shares were in fact forfeit, or whether, as stated in Faria's second letter, Pratik Diamonds was in the process of buying them back (*id.* at 19:23-21:2).  Finally, in response to this Court's questioning regarding the discrepancy between Kavadia's previous representation that he had never been an owner of Pratik Diamonds, and Faria's letter stating that, as recently as February 2015, he was in fact a shareholder, Kavadia testified that he had not considered himself an owner because he never had voting rights in Pratik Diamonds; that, while he previously "had shares, [they were] never in [his] possession"; and that he had never received compensation from the company.  (*Id.* at 22:7-18.)

Kavadia's post-hearing submission provides yet another set of strained assertions regarding his relationship to Pratik Diamonds and his supposed inability to obtain Pratik Diamonds records.  This submission, made by Fraade, states that "[w]hile [Kavadia] may have, at one point, been a director of Pratik Diamonds, he no longer has any rights due to the fact that he . . . no longer actively resides in India and therefore does not have the authority to obtain such records."  (Affirmation in Opposition to Plaintiffs' Motion To Impose Sanctions, undated ("Fraade Aff.") (Dkt. 156), at ¶ 9.)  Fraade alternately describes Kavadia as a current (*id.* ¶ 24)

and past (*id.* ¶ 13) shareholder in Pratik Diamonds, and argues, without specifying whether a buy-back of shares has in fact taken place, that the company's purported buy-back "would further extinguish whatever ability Kavadia may have had to obtain the requested documents, if he even had any ability at all" (*id.*).  If Bluestone or Fraade, as counsel for Kavadia in this case, has made *any* attempt to obtain a coherent picture of Kavadia's relationship to Pratik Diamonds, this is certainly not evident in any submission that either has made to this Court.

    **4. This Court's Factual Findings Regarding**
      **the Pratik Diamonds Documents_____**

   Based on all of the foregoing, this Court declines to revisit its initial finding – made in the December 2 Order – that Pratik Diamonds documents are within Kavadia's control.  At bottom, Plaintiffs have presented government records, apparently based on information supplied directly by the company, listing Kavadia as a director and the majority shareholder of Pratik Diamonds, and this Court cannot credit the labored and contrary assertions made by Kavadia and Pratik Diamonds.  This is particularly true given that neither has provided any documentation supporting their various contentions, and given that the representations made by both Amin and Faria were contained in unsworn letters.

   In addition, in light of the long history of evasive and contradictory explanations given by Kavadia as to his relationship with Pratik Diamonds – including his initial (and seemingly false) sworn statements that he had never been an "actual director," officer, or shareholder in Pratik Diamonds; the conflicting and unsubstantiated representations from Pratik Diamonds' attorneys regarding the status of Kavadia's ownership interest in the company; and Kavadia's (and his attorneys') repeated reliance on these representations, apparently without seeking any clarification from their authors – this Court finds that Kavadia's non-production of Pratik Diamonds documents was intentional and willful.

## DISCUSSION

I.   **SANCTIONS UNDER RULE 37 FOR
     SPOLIATION OR WITHHOLDING OF EVIDENCE**

   A.   **Range of Available Sanctions**

Rule 37 of the Federal Rules of Civil Procedure provides that, if a party fails to obey a discovery order, the court "may issue further just orders" to sanction the disobedient party, including, but not limited to, directing that certain facts be taken as established, precluding the party from supporting its claims or introducing certain matters in evidence, striking the party's pleadings or portions of its pleadings, staying the action pending compliance, dismissing the party's claims in whole or in part, rendering a default judgment against the party, or holding the party in contempt. Fed. R. Civ. P. 37(b)(2)(A). The Rule further provides that, "[i]nstead of or in addition to [any other sanction], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Although not explicitly listed in Rule 37, the Rule also allows for a court to sanction a party that has wrongfully destroyed documents it was obligated to preserve or has withheld documents it was obligated to produce by giving the jury an "adverse inference" instruction. In other words, as discussed in more detail below, the court may inform the jury of the nature of the party's misconduct and then instruct the jury that it may, or even that it should, draw inferences against the non-producing or destroying party.[15] *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392 (2d Cir. 2013).

---

[15] The court's power to grant an adverse inference instruction for spoliation of evidence "arises jointly under the Federal Rules of Civil Procedure and the court's own inherent powers." *Zublake v. Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("*Zublake IV*") (citations

With respect to the particular sanction imposed, "[i]t is well settled that the court has broad discretion to determine the type of sanction to impose upon a party, based on all the facts of the case." *AAIpharma Inc. v. Kremers Urban Dev. Co.*, No. 02cv9628 (BSJ) (RLE), 2006 WL 3096026, at *5 (S.D.N.Y. Oct. 31, 2006) (citation omitted).  A court's discretion in selecting an appropriate sanction should be guided by a number of factors, including:

> (1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the prejudice to the other party; (4) the duration of the period of noncompliance; and (5) whether the non-compliant party had been warned of the consequences of his noncompliance.

*King Harvest Dev., Ltd. v. Li*, No. 08cv8494 (DAB) (DF), 2010 WL 5174326, at *3 (S.D.N.Y. Dec. 10, 2010) (citations omitted).  In assessing district courts' exercise of discretion, reviewing courts have highlighted that, in addition to addressing misconduct in a particular case, sanctions also serve to deter future misconduct.  *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976); additional citation omitted).

## B.   Adverse Inference Instructions

A court may grant an adverse inference instruction as a sanction for the non-production of evidence, upon a showing "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the . . . claim or defense [of the other party] such that a reasonable trier of fact could find that it would support that claim or defense."  *Residential Funding v. DeGeorge Fin. Corp*, 306 F.3d 99, 108 (2d Cir. 2002)

---

omitted); *see Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses . . . and for the spoliation of evidence" (citations omitted)).

(quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)).  A court may also may grant an adverse inference instruction as a sanction for the spoliation of evidence, upon a similar showing:  "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the [other] party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Id.*  In making this assessment, the "culpability" and "relevance" factors often go hand in hand:  "When evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to demonstrate relevance."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y 2004) ("*Zubulake V*") (S.D.N.Y 2004) (citing *Residential Funding*, 306 F.3d at 109).

The Second Circuit has recently made clear that there is a dividing line between the type of adverse inference instruction that is "not a punishment" and "simply explains to the jury" the nature of its "fact-finding powers," *Mali*, 720 F.3d at 393, and the type of instruction that is punitive in nature, falling under Rule 37.  The former merely instructs the jury that, if it finds certain facts to be true based on the evidence presented to it, then it may draw inferences, including negative inferences, from those facts, *see id.*,[16] while the latter undertakes to inform

---

[16]  This is the type of adverse inference instruction that is included in one set of model instructions that have often been adapted for use by this Court.  *See* Leonard B. Sand *et al.*, 4-75 *Modern Federal Jury Instructions – Civil*, ¶ 75.01 (2015).  This sample instruction reads:

> You have heard testimony about evidence which has not been produced. Counsel for plaintiff (*or* defendant) has argued that this evidence was in defendant's (*or* plaintiff's) control and would have proven facts material to the matter in controversy.

> If you find that the defendant could have produced the evidence, and that the evidence was within his or her control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to

the jury of misconduct already determined by the court, upon its own fact-finding, with respect to the violation of a discovery obligation, *see Mali*, 720 F.3d at 392-93 (noting that "[i]t is axiomatic that a court may not punish without finding misconduct that merits the punishment," such that, before imposing discovery sanctions, "the court would need to make findings that justified the sanction").

Once a court, outside the presence of the jury, has made a factual determination that would warrant giving an adverse inference instruction as a sanction, the particular nature of the instruction will again lie within the discretion of the court. *See id.* Upon finding that evidence was wrongfully withheld or destroyed, a court "[may] . . . simply [tell] the jury those facts and nothing more; or it [may] add[] that the jury could, but need not, draw inferences against [the sanctioned party] based on those facts; or . . . that the jury *should* draw adverse inference against [the sanctioned party] based on those facts . . . ." *Id.* at 392 (emphasis in original; citing Fed. R. Civ. P. 37(b)(2)(A)). The trial court has "the leeway to tailor sanctions to insure that spoliators

> infer that the evidence would have been unfavorable to the defendant.
>
> In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether the defendant had a reason for not producing this evidence that was explained to your satisfaction. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case.

*Id.* (instruction 75-7); *see also, e.g., Zubulake V*, 229 F.R.D. at 439-40 (adapting Sand *et al.*'s model instruction in directing that the jury should be instructed that, if it determined that the defendant had not produced "evidence that was within its control, and that the evidence would have been material in deciding facts in dispute in [the] case, [the jury was] permitted, but not required, to infer that the evidence would have been unfavorable" to the defendant). The authors of the model instruction note that, while the instruction is generally warranted "when circumstances of the non-production manifest bad faith," the Second Circuit has approved of its use in cases where no bad faith has been found. Sand *et al.*, ¶ 75.01 (comment to instruction 75-7 (citing, *inter alia*, *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 383-84 (2d Cir. 2001))).

do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (citation omitted); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999) (noting that, in case of spoliation, trial court could, for example, instruct jury to make adverse inference from missing evidence or presume certain facts, or preclude the spoliator from introducing evidence on issue to which the missing evidence was relevant).

Most typically, it seems that courts in this circuit have not gone so far as to direct that a jury *should* draw a certain inference from a party's spoliation or withholding of evidence, instead opting to allow the jury to draw such inferences as it sees fit, from the facts presented. *See Byrnie*, 243 F.3d at 110 (noting that "a party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence. It then becomes a matter for the jury to decide, based on the strength of the evidence presented, whether the documents likely had such content"). Of course, merely informing the jury of a party's misconduct is itself a significant sanction, which, as a practical matter, may be difficult for the sanctioned party to overcome. *Cf. Zubulake IV*, 220 F.R.D. at 219-20 (noting that "[w]hen a jury is instructed that it may infer that the party who destroyed potentially relevant evidence did so out of a realization that the evidence was unfavorable, the party suffering this instruction will be hard-pressed to prevail on the merits" (internal quotation marks, alteration, and citation omitted)).

## II.    **APPROPRIATE SANCTIONS IN THIS CASE**

In their motion for sanctions, Plaintiffs request that, in addition to awarding Plaintiffs attorney's fees and costs in connection with the motion, the Court (1) strike Defendants' Answer, (2) dismiss Defendants' counterclaims, and (3) render a default judgment against Defendants on all of Plaintiffs' causes of action. (Plaintiffs' Notice of Motion To Impose Sanctions, dated

Jan. 29, 2015 (Dkt. 150).)  In support, Plaintiffs argue that such extreme sanctions are necessary because Kavadia's conduct demonstrates bad faith, and because his non-production seriously hampers Plaintiffs' ability to prosecute their claims and defend against Defendants' counterclaims.  (*See generally* Declaration of Matthew J. Harris in Support of Plaintiff[s'] Motion To Impose Sanctions, dated Jan. 30, 2015 (Dkt. 152).)  In opposition, Defendants argue that sanctions are not warranted at all because the "documents and emails Kavadia does have access to and the practical ability to obtain[] have been provided."[17]  (Fraade Aff. ¶ 24.) Bluestone has also submitted a supplemental affirmation recounting his actions in response to the December 2 Order – beginning, notably, with the January 15 pre-motion conference, after the expiration of Defendants' time to comply with the Order – and stating that, through his communications with Kavadia, Capelli, and Faria, he had "coordinated an extensive, diligent, and good faith effort" to comply with this Court's "requests."  (Affirmation in Support of Opposition to Plaintiff[s'] Motion To Impose Sanctions, undated (Dkt. 156-1), at ¶ 10.)

---

[17] In arguing that Kavadia complied with the December 2 Order to the best of his ability, Defendants rely on *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) for the key proposition that "a party is not obligated to produce, at the risk of sanctions, documents that it does not possess or cannot obtain."  (*See* Fraade Aff. ¶ 24.)  Their reliance on this case is rather ironic as, in *Shcherbakovskiy*, the Second Circuit ultimately upheld the district court's dismissal of a plaintiff's claims as a discovery sanction, in circumstances remarkably similar to those presented here.  *See Shcherbakovskiy*, 450 F. App'x 87, 89 (2d Cir. 2011). Specifically, the plaintiff in that case asserted that he could not access documents of a Russian corporation of which he was chairman and minority shareholder "because he was only the non-executive chairman" of the company.  490 F.3d at 134.  Similar to Kavadia, the plaintiff claimed that he "had asked the [company's] board for permission to produce the documents and the board refused," and provided "[s]everal documents" to the court – even more than what Kavadia provided in this case – including a "board resolution purporting to deny [p]laintiff's request for documents, various confidentiality agreements[,] and a letter . . . from a Russian attorney" opining on questions of Russian law.  *Shcherbakovskiy*, No. 03cv1220 (RPP), 2010 WL 3155169, at *6 (S.D.N.Y. July 30, 2010).  The district court, unpersuaded, dismissed the plaintiff's claims.

### A.    Adverse Inference Instruction, Informing
### Jury of Judicial Findings of Misconduct

As set forth above, this Court, following an evidentiary hearing, has made factual

findings that, while the parties were engaged in discovery disputes in connection with this action,

Kavadia deliberately destroyed email communications.  (*See supra* at Background A(5).)  In

addition, this Court has found that, despite Plaintiffs' requests and this Court's orders, Kavadia

intentionally withheld Pratik Diamonds documents that were within his control.  (*See supra* at

Background B(4).)  As this Court's findings support the conclusion that, with respect to both sets

of documents, Kavadia acted with a "culpable state of mind," an adverse inference instruction is

warranted, as a sanction, for the spoliation and non-production of evidence.

Plaintiffs have requested, and this Court has considered, "litigation-ending" sanctions.

Although such sanctions may be justified when a court finds "willfulness, bad faith, or any fault

of the sanctioned party," they are generally only to be used when the court "has considered lesser

alternatives" and found them inadequate to address the misconduct.  *S. New England Tel. Co. v.*

*Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (internal quotation marks and citations

omitted); *see West*, 167 F.3d at 780 (dismissal of action as sanction for spoliation of evidence

was abuse of discretion where sanctions such as adverse inference or preclusion of evidence

would have been adequate).  In this instance, while Kavadia's bad faith is manifest, and while

the documents that he failed to produce may be central to the parties' claims in this action, it is

nonetheless this Court's view that an adverse inference instruction that informs the jury of the

facts regarding his misconduct (coupled with the reimbursement of Plaintiffs' attorney's fees and

costs, as discussed in the following section), would be sufficient to remedy the prejudice that

Plaintiffs would otherwise suffer and to deter future misconduct.  Indeed, an adverse inference

instruction is designed to remedy precisely the type of harm occasioned here: "The prophylactic

26

and punitive rationales [for the adverse inference instruction] are based on the . . . commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly place the risk of an erroneous judgment on the party that wrongfully created the risk." *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998) (internal quotation marks, alteration, and citation omitted).

Accordingly, I recommend that, at trial, the Court inform the jury that, while under an obligation to produce documents relevant to this action, (1) Kavadia destroyed copies of email communications by deleting them from his email accounts and by installing on his computer, and executing, a document deletion program, and (2) Kavadia willfully withheld Pratik Diamonds communications and a bank statement of that company from July 2011, when such documents were within his control. I further recommend that, in addition to informing the jury of these facts, the Court proceed to instruct the jury that it may, but need not, infer that the destroyed and withheld documents would have been material in deciding the facts in dispute in the action, and would have been unfavorable to Defendants.[18]

## B. Award of Attorney's Fees and Costs

As discussed above, Rule 37 mandates that, where a party has failed to comply with a discovery order, the court must order the disobedient party, its attorney, or both to pay its opponent's reasonable expenses, including attorney's fees, caused by its failure, "unless the

---

[18] In conferences held by this Court, as well as in this Court's prior discovery orders (including the December 2 Order), this Court focused on failures by Kavadia to produce documents. (*See, e.g.*, Dec. 2 Order, at 1 n.1.) Nonetheless, to the extent Plaintiffs are entitled to any sanction against Kadavia for document spoliation and non-production, Plaintiffs are equally entitled to a sanction against defendant Nice Gems, given that Kavadia is the sole owner of Nice Gems (Declaration of Alan P. Fraade in Response to the Declaration of Matthew J. Harris in Advance of the March 9, 2015 Evidentiary Hearing, dated Mar. 6, 2016 (Dkt. 163), at ¶ 6), that he admittedly "ke[pt] all business records for Nice Gems" (Kavadia May 2014 Aff. ¶ 7) and kept some of Nice Gems' documents on his personal laptop computer (Hrg. Tr. 90:10-91:8), and that he used his personal email accounts to communicate on Nice Gems' behalf (*id.* 89:17-90:9).

failure was substantially justified or other circumstances make an award of expenses unjust."
Fed. R. Civ. P. 37(b)(2)(C).  In addition, courts routinely award attorney's fees in cases of
spoliation of evidence.  *See, e.g.*, *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D.
178, 185 (S.D.N.Y. 2014) ("To fully correct the prejudice to [defendant] from [plaintiff's]
spoliation, the [c]ourt also orders [plaintiff and its attorney] to pay [defendant's] reasonable
attorney's fees and costs in connection with the spoliation dispute"); *Taylor v. City of New York*,
293 F.R.D. 601, 616 (S.D.N.Y. 2013) (an award of attorney's fees and costs "is appropriate
because it serves the remedial purpose of making [p]laintiff whole for the costs he has incurred
as a result of [d]efendants' spoliation" (citations omitted)); *Artista Records LLC v. Usenet.com,
Inc.*, 608 F.Supp.2d 409, 444 (S.D.N.Y. 2009) (awarding expenses, including attorney's fees,
because, "[a]s a consequence of [d]efendants' actions, [p]laintiffs have been forced to expend
substantial resources investigating and analyzing [d]efendants' misconduct" (collecting
authority)).

        This case presents no exception.  Defendants' failure to comply with this Court's
discovery orders were not substantially justified.  Further, the Court has now determined that
Kavadia deliberately engaged in the spoliation of evidence and made false and misleading
statements to try to avoid his discovery obligations and obscure his conduct.  In connection with
their sanctions motion, Plaintiffs not only needed to prepare motion papers, but were also
required to prepare for and attend an evidentiary hearing, likely at a significant cost.  An award
of fees and costs is thus required to address Kavadia's misconduct, to deter future misconduct,
and to make Plaintiffs whole.

        The wrongdoing here has primarily been Kavadia's, as it is he who destroyed
communications and withheld Pratik Diamonds documents.  Bluestone, however, has

exacerbated the effects of Kavadia's misconduct.  For example, Bluestone has made multiple incomplete or misleading submissions to this Court – including, as discussed above, his drafting of Kavadia's inscrutable statements, his submissions regarding Kavadia's purported email recovery request to Yahoo!, and his submission of and reliance on an unsigned statement attributed to Kavadia – and, even after the inconsistencies and apparent errors in his submissions were drawn to his attention by this Court, he has neither corrected them nor clarified the underlying issues.  In addition, he has relied fully, apparently without any investigation, on Kavadia's (and Pratik Diamonds') dubious assertions and offered them unhesitatingly to this Court:  he represented that Kavadia's emails were inaccessible as a result of some combination of computer viruses, reformatting of his laptop computer, and email hacking, and he has continued to file and rely on Pratik Diamonds' enigmatic letters.  Finally, as detailed above and in the December 2 Order, Bluestone has repeatedly failed to comply with this Court's directives, all of which have been directed toward getting to the bottom of Kavadia's dubious representations.

  The total effect of Bluestone's conduct has been to veil Kavadia's misconduct, and, as a result, he should be required to bear a portion of Plaintiffs' expenses on their motion.[19]  Given that the problematic conduct was still primarily Kavadia's, this Court finds that it would be appropriate for Bluestone to bear 25 percent of those expenses, including reasonable attorney's fees.  *See* Fed. R. Civ. P. 37(b)(2)(C) (the court must "order the disobedient party, the attorney advising that party, or both" to pay the opposing party's reasonable expenses, including attorney's fees); *see also Rates Tech. Inc. v. Mediatrix Telecom, Inc.*, No. 05cv2755 (JS) (AKT),

---

[19] Although Kavadia has now retained Fraade as co-counsel, and although, as discussed above, Fraade's submissions also raise questions, it is this Court's view that imposing sanctions against Fraade would be inappropriate at this time, due to his limited participation in the action to date.

2008 WL 8443564, at *6 (E.D.N.Y. Sept. 2, 2008) (it is a "well-settled principle that district courts enjoy wide discretion in sanctioning litigants who appear before them" (citations omitted)), *report and recommendation adopted* Jan. 5, 2010 (Dkt. 173); *Commodity Futures Trading Comm'n v. Royal Bank of Canada*, No. 12cv2497 (AKH), 2014 WL 1259773, at *1 (S.D.N.Y. Mar. 28, 2014) (directing defendant and its counsel, jointly and severally, to reimburse plaintiff for expenses incurred as a result of violation of discovery order).

Accordingly, this Court recommends that Defendants, jointly and severally, be required to reimburse Plaintiffs for 75 percent, and Bluestone be required to reimburse Plaintiffs for 25 percent, of the reasonable expenses, including reasonable attorney's fees, they incurred in: preparing their motion for sanctions and supporting submissions (Dkts. 150, 152), preparing their reply affirmations (Dkts. 157, 159[20]), preparing the supplemental submission requested by this Court (Dkt. 162), and preparing for and attending the evidentiary hearing conducted on March 9, 2015.[21]

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Plaintiffs' motion for sanctions (Dkt. 150) be resolved as follows:

(1)     The jury should be instructed that:

(a)     while under an obligation to produce documents relevant to this action,

(i)     Kavadia destroyed email communications by deleting them from his email accounts and by

---

[20] Plaintiffs submitted the second "reply" after Defendants filed Capelli's report, disclosing the installation of the "Eraser" program on Kavadia's laptop computer.

[21] This Court recommends that the preparation of Plaintiffs' post-hearing submission (Dkt. 170) be excluded from the award, as it consists almost entirely of a recitation of the same factual and procedural background as Plaintiffs included in their pre-hearing submissions.

installing and executing a document deletion
program on his laptop computer, and

(ii)   Kavadia willfully withheld Pratik Diamonds
communications and July 2011 bank statement,
when those documents were within his control; and

(b)   on this basis, the jury may, but need not, infer that the
destroyed and withheld documents would have been
material in deciding the facts in dispute in the action, and
would have been unfavorable to Defendants.

(2)   Defendants and Bluestone should be directed to reimburse
Plaintiffs for the reasonable expenses, including attorney's fees,
that they incurred in preparing their motion for sanctions,
supporting submissions, reply affirmations, and supplemental
submission (Dkts. 150, 152, 157, 159, 162), and in preparing for
and attending the evidentiary hearing conducted on March 9, 2015.

(3)   Defendants, jointly and severally, should bear 75 percent of the
attorney's fees and costs specified above, and Bluestone should
bear the remaining 25 percent.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the

Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, Room 2210, New York,

New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl

Street, Room 1660, New York, New York, 10007.  Any requests for an extension of time for

filing objections must be directed to Judge Torres.  FAILURE TO FILE OBJECTIONS WITHIN

FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         May 13, 2014

                                        Respectfully submitted,

                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

All counsel (via ECF)