UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
JOSE MARIA ALVES DECASTRO et al.,                                      :
                                                                       :
                                        Plaintiffs,                    :
                                                                       :         12-CV-1386 (JMF)
            -v-                                                        :
                                                                       :         OPINION AND ORDER
DEEPAK KAVADIA et al.,                                                 :
                                                                       :
                                        Defendants.                    :
                                                                       :
-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/03/2018

JESSE M. FURMAN, United States District Judge:

  At the heart of this case, which was tried to a jury in March 2017, lies a dispute over the ownership of fourteen uncut diamonds. At the time of trial, the parties apparently believed that the diamonds, purportedly of museum quality, were worth approximately $35 million, but it now appears that they are worth a small fraction of that amount. Now pending is a narrower dispute over who has priority with respect to proceeds from the sale of the diamonds. The issue arises because, on November 11, 2017, the Court granted the unopposed motion of Matthew Harris, Esq., to withdraw as counsel to Plaintiffs Jose Maria Alves DeCastro and DJJ-Mining & Services (Private) Limited ("DJJ-Mining"). (Docket Nos. 323, 355). On March 11, 2018, Harris filed a motion to enforce an attorney's charging lien against DeCastro pursuant to Section 475 of the New York Judiciary Law, essentially arguing that he should be paid from the proceeds of the sale of the diamonds before anyone other than the third-party custodian that has been holding the diamonds at the Court's direction. (Docket No. 391). DeCastro and nonparty Gideon Finkelstein, who holds a judgment against DJJ-Mining and thus also claims a stake in the

fourteen diamonds, oppose the motion. (Docket Nos. 397 ("Finkelstein Mem."), 399 ("DeCastro Mem.")). For the reasons that follow, Harris's motion is GRANTED.

## BACKGROUND

The Court will only briefly recount the thorny procedural history of this case, familiarity with which is assumed. On February 24, 2012, DeCastro and his company, DJJ-Mining, commenced this action against Deepak Kavadia and Nice Gems, Inc. (Docket No. 1). Among other things, Plaintiffs claimed that Defendants had breached their obligations under certain agreements between the parties and that Plaintiffs were entitled to fourteen museum-quality rough, uncut diamonds in Kavadia's possession, (*id.*; *see also* Docket Nos. 6-2, 39), which were seized pursuant to an April 4, 2012 Order of the Court and which have been held since that seizure by third-party custodian Dunbar Global Logistics, Inc. ("Dunbar"), (Docket No. 19). Harris was hired by Plaintiffs pursuant to a retainer agreement executed on November 19, 2013, and he entered notices of appearance on January 23 and 24, 2014. (Docket Nos. 96, 97; *see also* Docket No. 392, Ex. 1). On Plaintiffs' behalf, Harris litigated and won a motion to compel discovery and a motion for sanctions against Defendants. (*See, e.g.*, Docket Nos. 103, 112, 119, 150, 168, 186).

On the eve of trial, the parties agreed to limit the claims to be tried to those between DeCastro and Kavadia as individuals, dropping their respective companies. (Docket No. 308, Ex. 4, at 2; Docket No. 309, Ex. 11). The parties further stipulated that "rightful ownership of the 14 diamonds is not a question for the jury to consider. . . . If the jury decides that [DeCastro repaid Kavadia $380,000]," as DeCastro claimed, "then [the] 14 diamonds belong to DeCastro." (Docket No. 306, at 3). On March 10, 2017, the jury returned a verdict in favor of DeCastro, finding that he had returned the $380,000 in question to Kavadia, (Docket No. 309, Ex. 11).

Because both parties indicated an intent to file post-trial motions, however, the Court ordered that Dunbar should continue to hold the diamonds. (Docket No. 310).

Shortly before post-trial motions were due, Kavadia filed a suggestion of bankruptcy with the Court. (Docket No. 311). The Court then entered an Order staying proceedings in accordance with the automatic stay provisions of the U.S. Bankruptcy Code. (Docket No. 315). Within the span of several days, Harris submitted a motion seeking to have the diamonds released from Dunbar to DeCastro, (Docket No. 313); Dunbar sought an order compelling payment of its fees and costs or ordering the sale of the diamonds to allow for the payment of those fees and costs, (Docket No. 314); and nonparty Gideon Finkelstein filed letters with the Court asserting his own interest in the diamonds pursuant to a default judgment he had obtained against DJJ-Mining in New York state court, (Docket Nos. 316, 318; *see also* Docket No. 223). The Court rejected these requests to address the ownership and possession of the diamonds in light of the bankruptcy stay. (Docket Nos. 317, 319, 320).

On July 24, 2017, Harris filed a motion to withdraw as counsel, claiming that there had been "a long-developing breakdown in the attorney-client relationship" between him and Plaintiffs and that his legal fees had not been paid. (Docket No. 323, Ex. 2, ¶ 3). After substitute counsel entered an appearance on behalf of Plaintiffs and indicated that Plaintiffs did not oppose Harris's motion to withdraw, the Court granted the motion as unopposed. (Docket No. 355). Thereafter, with the bankruptcy stay lifted as to the fourteen diamonds, (Docket No. 324), the Court authorized the parties to get the diamonds appraised so they could be sold and the proceeds distributed among the various claimants. (Docket No. 337). The diamond expert selected by the remaining parties concluded that the diamonds — which the Plaintiffs had previously represented were worth approximately $35 million, (Docket No. 1) — were in fact worth only

$413,450. (Docket No. 360). The Court authorized the sale of the diamonds at auction, (Docket Nos. 386, 390), and determined, without objection from the parties, that Dunbar should be reimbursed first out of the proceeds from the auction for its fees and costs, with the Court to resolve prioritization of other claims on the proceeds through motion practice, (Docket No. 394, at 2-3). Accordingly, Harris filed the instant motion to enforce his attorney's charging lien against DeCastro. (Docket No. 391). DeCastro and Finkelstein oppose the motion. (Finkelstein Mem.; DeCastro Mem.).

The diamonds were initially sold at an auction conducted by Alex Cooper Auctioneers ("Cooper") on May 10, 2018, for a gross amount, prior to commission and expenses, of $428,000. (Docket No. 402, at 1). Subsequent to the auction, however, the Gemological Institute of America tested the diamonds and discovered that several of the diamonds (the "Treated Lots"), which collectively sold for $221,000, had been treated to change their color, making them appear substantially more valuable than they actually were. (*Id.* at 1-2).[1] In accordance with the limited right of rescission set forth in Cooper's standard terms and conditions, the putative buyers returned the Treated Lots and received a full refund. (*Id.*). In addition, two of the diamonds (the "Delinquent Lots"), which sold for $135,000, were purchased by a representative of the Plaintiffs, DeCastro's son, who failed to pay for his purchase despite numerous efforts by Cooper to collect. (*Id.* at 2). The Delinquent Lots thus remained in Cooper's possession, along with net proceeds from the successful sales of $61,466.50. Ultimately, the Treated Lots and the Delinquent Lots were sold at a subsequent Cooper auction on August 23, 2018, for $72,500. (Docket No. 431, at 1). Dunbar was paid for its expenses and

---

[1] The remaining parties agree that it would have been impossible for the jointly selected appraiser to detect that the diamonds had been treated. (Docket Nos. 404, 418).

fees out of the net proceeds of the auction; the remainder — $59,337.50 — has been deposited in the Court registry pending this Court's decision on the allocation of the funds. (*Id.* at 2).

## LEGAL STANDARDS

Section 475 of the New York Judiciary Law provides that an "attorney who appears for a party has a lien upon his or her client's cause of action, . . . which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come." N.Y. Judiciary Law § 475. By the statute's terms, charging liens "are available only to an 'attorney of record,' although 'an attorney's participation in the proceedings *at one point* as counsel of record is a sufficient predicate for invoking [Section 475's] protection." *Petition of Harley & Browne*, 957 F. Supp. 44, 48 (S.D.N.Y. 1997) (alteration in original) (citations omitted) (quoting *Rodriguez v. City of N.Y.*, 489 N.E.2d 238, 239 (N.Y. 1985) and *Klein v. Eubank*, 663 N.E.2d 599, 600 (N.Y. 1996)).

A charging lien "gives the attorney an equitable ownership interest in the client's cause of action and ensures that he can collect his fee from the fund he has created and obtained on behalf of his client." *In re Schick*, 215 B.R. 13, 15 (Bankr. S.D.N.Y. 1997) (citations omitted). "The lien comes into existence, without notice or filing, upon commencement of the action or proceeding." *LMWT Realty Corp. v. Davis Agency Inc.*, 649 N.E.2d 1183, 1186 (N.Y. 1995). "[B]ecause a cause of action is a species of property, an attorney acquires a vested property interest in the cause of action at the signing of the retainer agreement and thus a title to property and rights to property." *Id.* (internal quotation marks omitted). The statute "creates an equitable right and remedy cognizable in the federal courts." *Markakis v. S.S. Mparmpa Christos*, 267 F.2d 926, 927 (2d Cir. 1959); *see also Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 449 (2d Cir. 1998). Further, because the "statute is remedial in character," it must

"be construed liberally in aid of the object sought by the legislature, which was to furnish security to attorneys by giving them a lien upon the subject of the action." *Fischer-Hansen v. Brooklyn Heights R. Co.*, 66 N.E. 395, 397 (N.Y. 1903).

"The prerequisites to the creation of a charging lien are well-settled; as a result of the attorney's efforts, (1) the client must assert a claim, (2) which can result in proceeds (3) payable to or for the benefit of the client." *In re Schick*, 215 B.R. at 15; *see also Oppenheim v. Pemberton*, 563 N.Y.S.2d 908, 910 (App. Div. 1990) ("The lien applies only to proceeds created through the attorney's efforts."). "While this statutory charging lien comes into existence upon commencement of an action or proceeding, the lien attaches only when proceeds in an identifiable fund are created by the attorney's efforts in that action or proceeding." *City of Troy v. Capital Dist. Sports, Inc.*, 759 N.Y.S.2d 795, 797 (App. Div. 2003) (citation omitted). That is, "the litigation or settlement must result in more than the mere entry of a judgment on behalf of a client: there must be proceeds from the litigation upon which the lien can affix." *Banque Indosuez v. Sopwith Holdings Corp.*, 772 N.E.2d 1112, 1117 (N.Y. 2002). This is because permitting a lien when no such proceeds exist "would result in unwarranted judicial legislation establishing a non-possessory attorney's lien encumbering a large portion of his client's general assets not identifiable with any specific litigation." *Goldstein, Goldman, Kessler & Underberg v. 4000 E. River Rd. Assocs.*, 409 N.Y.S.2d 886, 889 (App. Div. 1978).

As this Court has noted, a charging lien "should be fixed at the . . . fair and reasonable value of the services rendered, determined at the time of the discharge and computed on the basis of *quantum meruit*." *Winkfield v. Kirschenbaum & Phillips, P.C.*, No. 12-CV-7424 (JMF), 2013 WL 371673, at *2 (S.D.N.Y. Jan. 29, 2013) (internal quotation marks omitted); *Kovach v. City Univ. of N.Y.*, No. 13-CV-7198 (LGS), 2015 WL 3540798, at *4 (S.D.N.Y. June 4, 2015) ("The

theory of *quantum meruit*, rather than the retainer agreement, is the basis for determining the amount at which to fix the charging lien."). The factors to be considered include "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained (to the extent known)." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 148 (2d Cir. 1998). "After considering the factors relevant to a *quantum meruit* fee analysis, it is appropriate for the court to turn[ ] to lodestar analysis to reach a specific dollar figure for the value of the services rendered." *Winkfield*, 2013 WL 371673, at *2 (alteration in original) (internal quotation marks omitted).

## DISCUSSION

There is no dispute that, as a result of Harris's efforts as the attorney of record in this case, DeCastro prevailed on his affirmative claim and the litigation "result[ed] in more than the mere entry of a judgment" on DeCastro's behalf. *Banque Indosuez*, 772 N.E.2d at 1117. Nevertheless, DeCastro and Finkelstein contend that Harris is not entitled to a charging lien on other grounds. (Docket No. 396 ("Serota Aff."), ¶¶ 16-67; DeCastro Mem. 3-4). Finkelstein also argues that his claim to the diamonds should be granted priority over any lien Harris might have. (Serota Aff. ¶¶ 12-15; Finkelstein Mem. 5-9). Finally, the parties quarrel over whether the amount Harris seeks in compensation for his service reflects the fair and reasonable value of the service rendered. (DeCastro Mem. 4-5). The Court addresses each issue in turn.

**A.    Harris's Entitlement to a Charging Lien**

First, DeCastro disputes Harris's entitlement to a charging lien on the ground that the fourteen diamonds he helped procure do not constitute the kind of "proceeds" to which a charging lien could attach. (*See* DeCastro Mem. 2-4). As an initial matter, the cases to which

7

DeCastro cites do not support the argument that diamonds cannot constitute "proceeds" within the meaning of Section 475. Instead, they stand primarily for the more basic proposition that a charging lien attaches only when an attorney's efforts in a case result in an identifiable fund for his client — as opposed to "merely defend[ing] or protect[ing] his client's interest in property" that the client already possesses. *Petition of Rosenman & Colin*, 850 F.2d 57, 61, 63 (2d Cir. 1988) (no charging lien where a party "merely retained what she was undisputedly entitled to before the litigation began, which was considerably less than what she claimed she was entitled to"); *see also Hampshire Grp. Ltd. v. Scott James Co.*, No. 14-CV-2637 (MHD) (JGK), 2015 WL 5306232, at *7 (S.D.N.Y. July 27, 2015) (no charging lien where the parties' settlement agreement "simply memorialized the parties' earlier intention to walk away from the claims and counterclaims without any monetary transfer"); *Zelman v. Zelman*, 833 N.Y.S.2d 375, 377 (Sup. Ct. 2007) ("Moreover, where the attorney's services do not create any proceeds, but consist solely of defending a title or interest already held by the client, there is no lien on that title or interest."). Other cases DeCastro cites are simply irrelevant. *See Galvez v. Aspen Corp.*, 967 F. Supp. 2d 615, 624-26 (E.D.N.Y. 2013) (no charging lien where counsel had represented the plaintiff in a proceeding other than the one giving rights to the proceeds at issue); *Kaplan v. Reuss*, 495 N.Y.S.2d 404, 407 (App. Div. 1985) (attorney waived the right to a charging lien on insurance proceeds by taking actions inconsistent with an intent to enforce the lien), *aff'd*, 497 N.E.2d 671 (N.Y. 1986). DeCastro points to no case in which a court declined to enforce an attorney's charging lien on the ground that the "proceeds" derived from the attorney's efforts were not cash. In fact, courts have held that non-cash proceeds can qualify as "proceeds" for purposes of Section 475. *See, e.g.*, *Tunick v. Shaw*, 842 N.Y.S.2d 395, 397 (App. Div. 2007)

8

(finding that a collection of valuable photographs in which the attorney's client was granted an interest at the culmination of litigation constituted "proceeds" under Section 475).

In any event, the point is moot because, as noted, the diamonds have now been sold, (Docket No. 431), creating an "identifiable fund" to which a lien may attach. *See, e.g.*, *Cohen v. Grainger, Tesoriero & Bell*, 622 N.E.2d 288, 289 (N.Y. 1993) ("[T]he lien is imposed on the cause of the action and that the proceeds, *wherever found*, are subject to it." (emphasis added)); *Fischer-Hansen*, 66 N.E. at 398 ("[T]he general rule is that a lien upon property attaches to whatever the property is converted into, and is not destroyed by changing the nature of the subject. . . . It clings to any property or money into which the subject can be traced, until it reaches the hands of a bona fide purchaser."); *see also, e.g.*, *Moody v. Sorokina*, 856 N.Y.S. 2d 755, 757 (App. Div. 2008) (finding that an attorney's efforts had created "proceeds" where his client ultimately obtained cash in the amount of her equitable share of a vehicle, even though the dispute involved the ownership of the vehicle itself). Notably, DeCastro himself seems to assume as much, arguing in his opposition that, "[t]o the extent any proceeds in respect of the Diamonds ultimately are realized, the value of such proceeds will only become known following the contemplated sale of the Diamonds at auction." (DeCastro Mem. 4 n.*).

Finkelstein raises several other arguments in opposition to Harris's claim to a charging lien. First, he argues that Harris did not "through his own efforts" create the fund from which he seeks to collect because the diamonds taken into the Court's custody in April 2012, nearly two years before Harris entered a notice of appearance in this case. (Serota Aff. ¶ 28). But the relevant question is not when the diamonds came into the Court's custody; instead, it is whether, through Harris's efforts, his client's affirmative claim resulted in proceeds payable to, or for the benefit of, the client — which they clearly did. *See In re Schick*, 215 B.R. at 15. It is irrelevant

9

to the ultimate disposition of the diamonds in DeCastro's favor that while the ownership of the diamonds was being litigated by the parties, the Court ordered those diamonds to be seized and maintained by Dunbar. In fact, that is precisely what happened in *Tunick*: The court appointed a receiver to take possession of the photographs that were at issue in the dispute, well before one of the two attorneys seeking to enforce a charging lien had entered the scene, yet that attorney's charging lien was nonetheless held to be valid. 842 N.Y.S.2d at 396. *But see Case v. Case*, 970 N.Y.S.2d 151, 154 (App. Div. 2013) (concluding that an attorney's efforts did not create funds where they were in receivership before the attorney entered the case).

Finkelstein also observes that "Harris certainly did *not by his own efforts* create the 14 diamonds." (Serota Aff. ¶ 35). Finkelstein is surely not suggesting that Harris has no entitlement to a lien because he did not create the diamonds themselves, as that would be absurd. *Cf. Tunick*, 842 N.Y.S.2d at 397 (holding that attorneys were entitled to a lien with respect to photographic images that "were in existence before the professional involvement of [the attorneys]"). Instead, the Court interprets Finkelstein to be arguing that, because the jury verdict did not expressly award the diamonds to DeCastro or determine that DeCastro was the rightful owner of the diamonds, Harris's efforts did not procure the diamonds for DeCastro. (Serota Aff. ¶ 36 ("The Jury Verdict Form sets forth what Mr. Harris obtained *in this specific litigation by Mr. Harris's own efforts during the time when Mr. Harris was counsel of record*. And there is no mention in the Jury's Verdict Form of the 14 diamonds, nor of any 'determination' of the true owners of the 14 diamonds, nor of any 'determination' of any person's or any entity's rights with respect to the 14 diamonds in the Jury's Verdict."). But that argument ignores the larger context. The parties and Court agreed that ownership of the diamonds would be dictated by the jury's finding on whether DeCastro had repaid Kavadia $380,000 and need not be put to the jury as a

10

separate question. (Docket Nos. 306, at 3; *see also* Docket No. 308). The Court advised the jury of that arrangement and instructed the jury that it was not to separately consider ownership of the diamonds. (Docket No. 308, Ex. 4, at 10). Thus, the jury's verdict — procured through Harris's efforts — did encompass a decision as to the fourteen diamonds. *See* N.Y. Judiciary Law § 475 (entitling an attorney of record to a lien on his client's cause of action, "which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof *in whatever hands they may come*" (emphasis added)). Accordingly, the Court concludes that the prerequisites of an enforceable attorney's charging lien have been met. *See In re Schick*, 215 B.R. at 15.

**B.     Prioritization of Harris's Charging Lien**

Next, Finkelstein argues that his purported claim to the diamonds — based on his default judgment against DJJ-Mining for $848,000 and security interest perfected via a UCC-1 financing statement — should take precedence over Harris's charging lien. (Serota Aff.; Finkelstein Mem.).[2] Assuming for the sake of argument that Finkelstein has any claim against DeCastro to the diamonds, the Court concludes that Harris's lien nonetheless takes priority over that claim.[3]

---

2      Finkelstein initially objects to Harris's motion on procedural grounds, arguing that it should have been raised in a separate proceeding because "an attorney *must* commence a separate action to enforce a charging lien against a third party (like Mr. Finkelstein) who is not and has never been attorney Mr. Harris's client." (Serota Aff. ¶ 3 n.1). Of course, Harris's motion to enforce his charging lien is against his former client, DeCastro, and not against Finkelstein, who correctly notes that he "is not now and has never been a party in the underlying action in this Federal case at all." (*Id.*; *see also* Docket No. 393 ("Harris Mem."), at 1 ("This Memorandum of Law is respectfully submitted by Matthew J. Harris in support of his Motion to Enforce an Attorney Charging Lien Against Jose Maria Alves DeCastro.")). Harris properly raised his claim against his former client in the instant action, *see, e.g.*, *Itar-Tass Russian News Agency*, 140 F.3d at 448, and Finkelstein's procedural challenge is meritless.

3      There is some reason to doubt that Finkelstein has a valid claim to the fourteen diamonds — insofar as they were awarded to DeCastro in his individual capacity. Although Finkelstein originally filed suit in New York state court against both DeCastro and DJJ-Mining, he appears to have moved for default judgment against only DJJ-Mining, and his default judgment is

11

*LMWT Realty* is instructive. In that case, the plaintiff owned two buildings that were damaged in a fire and submitted a claim to its insurer seeking indemnification for the loss. *See* 649 N.E.2d at 1184. The insurer disputed the claim, and the plaintiff, through its counsel, sued to recover the insurance proceeds. *Id.* The case settled prior to trial, but the insurance company refused to issue the settlement check because the City of New York had previously asserted a first-in-time lien against the proceeds of the policy pursuant to a municipal statute that authorized tax districts "to file claims for unpaid taxes and assessments against the proceeds of a policy of fire insurance insuring an owner of real property in the district." *Id.* at 1185. Counsel for the plaintiffs conceded that the City was entitled to the majority of the settlement proceeds, but argued that the attorneys' charging lien should be paid out of the insurance policy recovery first — notwithstanding a provision in the statute creating the lien providing that the City's lien "shall . . . be prior to all other liens and claims except the claim of a mortgagee of record named in such policy." *Id.* (alteration in original) (internal quotation marks omitted). The Court of Appeals agreed with plaintiff's counsel, noting that equitable considerations required that the attorneys be

---

accordingly against DJJ-Mining alone. (Docket No. 398, Ex. 1, at 2-4, 13-21; Ex. 2, at 2-5). Moreover, the New York default judgment refers only to the $848,000 DJJ-Mining purportedly owes Finkelstein and did not involve a decision with respect to the ownership or possession of the diamonds. (*Id.*). DJJ-Mining was dismissed from this case prior to trial and, therefore, has no claim to the diamonds as a result of the jury's verdict. And a UCC-1 filing, while necessary to *perfect* a security interest, does not create a security interest in the first instance; nor can it expand the scope of the underlying interest it perfects. *See, e.g., Painewebber Inc. v. Nwogugu*, No. 98-CV-2441 (DLC), 1998 WL 193110, at *5 (S.D.N.Y. Apr. 22, 1998); *United States v. Greenstreet*, 912 F. Supp. 224, 227-28 (N.D. Tex. 1996). Finkelstein suggests that DJJ-Mining is essentially an alter ego of DeCastro; he also makes the dubious claim that DeCastro has conceded the point by adopting the rationale Finkelstein set forth in his initial opposition to Harris's charging lien petition. (Serota Aff. ¶¶ 9-10; Finkelstein Mem. 4, 10-17). Ultimately, however, it is unnecessary for the Court to resolve these somewhat convoluted issues.

compensated for their service first because, but for the attorneys' efforts, the fund subject to the City's taxing lien would not have existed at all. *Id.* at 1186-87.

In the Court's view, the *LMWT Realty* Court's reasoning applies with equal — indeed perhaps greater — force here. As in *LMWT Realty*, Harris's services "created the fund at issue, and under those circumstances the attorney's charging lien must be given effect, even [if] a prior lien against the specific fund exists." 649 N.E.2d at 1186. Put differently, but for Harris's efforts, the diamonds would have remained in the possession of Kavadia, precluding *both* DeCastro and Finkelstein from access to them. *See id.* at 1187 (finding it relevant that "an attorney's services were necessary to procure" the proceeds to which the first-in-time lien attached). Moreover, in *LMWT Realty*, the statute pursuant to which the City's lien arose expressly gave the taxing district's lien priority over all liens and claims other than those specifically named in the statute, reflecting the legislature's "intent to recognize no other exceptions to the City's priority." *Id.* at 1185. The Court of Appeals nonetheless concluded that the City's first-in-time claim against the specific fund at issue was superseded by the attorneys' charging lien because of equitable considerations and because the City had, "at best, only a potential and inchoate right to the fire insurance proceeds" that could not be collected absent attorney efforts where the insurer refused to make a reimbursement under the policy. *Id.* at 1186-87. Here, there is no statute purporting to grant Finkelstein priority. The Court thus concludes that to allow Finkelstein "to recover the entire fund created by [Harris's] efforts would be inequitable" and that Harris's charging lien takes priority. *Id.* at 1187. Any claim Finkelstein might have against DeCastro to the diamonds "attache[s] only to the extent of [DeCastro's] right to the proceeds," which in turn is "diminished to the extent of [Harris's] charging lien." *Id.* at 1187.

Finkelstein attempts to distinguish *LMWT Realty* on several grounds, none of which is persuasive. First, he suggests that a distinction can be made on the ground that Harris did not initiate DeCastro's suit but was instead substituted in as counsel of record during the course of the litigation. (Serota Aff. ¶ 19). While this is indeed a point of factual difference, it does nothing to detract from the Court's conclusion as a matter of equity that Harris's efforts are in substantial part responsible for the procurement of the diamonds for his former client, DeCastro. *Cf. Klein*, 663 N.E.2d at 600 ("[A]n attorney's participation in the proceeding *at one point* as counsel of record is a sufficient predicate for invoking the statute's protection." (citation omitted)). Moreover, the timing of the attachment of the charging lien was not relevant in *LMWT Realty*, where the Court of Appeals concluded that the attorneys' lien took priority even though the City's lien was first in time; it similarly has no bearing on the prioritization question here. Finkelstein also claims that, "in the *LMWT* case the property over which the attorney/law firm was seeking to have its attorney's charging lien have priority was *different property* from that on which the opposing claimant had its lien. In the *LMWT* case, the opposing claimant had a tax lien against specific real property; while the attorney/law firm's attorney charging lien was against entirely different personal property that was monetary insurance policy proceeds." (Serota Aff. ¶ 20). This assertion is incorrect: The municipal provision giving rise to the City's tax lien authorized the lien against "the proceeds of a policy of fire insurance insuring an owner of real property in the district," and the claim "constitute[d] a *lien against the policy proceeds*" — the very property the attorneys sought to attach. *LMWT Realty*, 649 N.E.2d at 1185 (emphasis added).

Finkelstein points to several cases in support of his argument that his purported security interest should take priority over Harris's, but none compels a different outcome in this case. He

14

relies most heavily on *Case v. Case*, 970 N.Y.S.2d at 154, for the proposition that Harris's charging lien cannot "relate back" to the initiation of the suit but instead arose when the attorneys subsequently entered their notice of appearance. (*See* Serota Aff. ¶¶ 42-61). Yet that proposition is irrelevant to the instant dispute; indeed, the Court has assumed that Finkelstein both has a claim to the diamonds against DeCastro and that his claim arose before Harris's charging lien. *LMWT Realty* makes abundantly clear that a prior claim against a specific fund "may" supersede an attorney's charging lien but need not do so, as the Appellate Division in *Case* recognized. *Case*, 970 N.Y.S.2d at 154. Finkelstein also points to *Banque Indosuez* for the proposition that "the prior perfected security interest takes precedence over the attorney's charging lien." (Serota Aff. ¶ 63). But *Banque Indosuez* actually sought to resolve the "tension between an attorney's right to collect under a charging lien and an adverse party's right to a setoff — specifically, which has priority over the other." 772 N.E.2d at 1116. In that matter, the competing interests arose from the same litigation, and the Court of Appeals's holding was that "where the setoff is the result of judgments emanating from the same transaction or instrument," the "balancing of [the] equities" might allow the adverse party's interest to supersede that of the attorney's. *Id.* at 1117.

Finkelstein also argues that the equities do not favor Harris because Harris, at some point during the litigation, became aware of Finkelstein's claim to the diamonds. Finkelstein asserts in conclusory fashion that Harris has had "constructive knowledge" of Finkelstein's UCC-1 since it was perfected on November 14, 2013. (Serota Aff. ¶ 64). More relevantly perhaps, Finkelstein notes that he filed his UCC-1 on the docket in this case on July 28, 2016, and Mr. Harris can be assumed to have had knowledge of Finkelstein's claim from that point forward. Such knowledge is not dispositive, however. In *LMWT Realty* itself, for instance, the City served certificates of

15

special lien on the insurer's adjuster as soon as it was notified of the plaintiff's claim, and the plaintiff's attorneys were presumably on notice throughout the litigation that the City asserted a first-in-time interest. 649 N.E.2d at 1185. And in that matter it was quite clear to all concerned that the City's tax lien was valid and, by statute, took priority over "all other liens and claims." *Id.* In this matter, by contrast, it is unclear when Harris first became aware that Finkelstein asserted a claim to the diamonds — and, in fact, there is some uncertainty still about whether Finkelstein has a valid claim against DeCastro at all. In any event, Finkelstein's interest has been vigorously contested throughout the litigation, and the Court sees no basis in *LMWT Realty* or in equity to deprive Harris of his entitlement to payment for his services simply because he was aware that another party asserted a right to property that his client also claimed.

Finally, Finkelstein suggests that affording Harris's charging lien priority over his own purported claim to the diamonds would "overturn or reverse a Final New York State Judgment," referring to the December 31, 2014 New York Supreme Court judgment against DJJ-Mining. (Serota Aff. ¶ 6). That suggestion is meritless. This Court expresses no view on — and has no reason to dispute the validity or enforceability of — the state court default judgment determination and subsequent denial of DJJ-Mining's motion to reopen the New York state action. Instead, this Court resolves the more limited question properly before it, which is the prioritization of competing interests in the same fund. While it is unfortunate that multiple parties assert claims to the same property (and that the property is likely not sufficient to satisfy all of those claims), the Court is cognizant of its obligation to construe Section 475 "liberally in aid of the object sought by the legislature, which was to furnish security to attorneys by giving them a lien upon the subject of the action," *Fischer-Hansen*, 66 N.E. at 397, and it finds that the balance of the equities supports prioritizing Harris's charging lien.

16

## C. The Amount Due to Harris

Having concluded that Harris is entitled to have his charging lien enforced against DeCastro, the Court would ordinarily turn to the task of determining the amount Harris is due based on the "fair and reasonable value of the services rendered . . . computed on the basis of *quantum meruit*." *Winkfield*, 2013 WL 371673, at *2 (internal quotation marks omitted). At a post-trial conference in which Harris's anticipated motion was discussed at length, the Court made clear its view that *quantum meruit* — and not the terms of Harris's retainer agreement with DeCastro — would govern the any amount Harris would receive on a charging lien, absent a persuasive argument by Harris to the contrary. (Docket No. 394, at 14-15 (citing *Winkfield*, 2013 WL 371673)). And Harris in his brief does not cite any cases supporting the proposition that a retainer agreement can set the amount due under a Section 475 charging lien, instead relying solely on inapposite New York cases providing that, under an *account stated* theory, a "bill to which the recipient has made no objection may be considered accepted by the recipient and correct." (Harris Mem. 8 (citing *Morrison Cohen Singer & Weinstein, LLP v. Waters*, 786 N.Y.S.2d 155 (App. Div. 2004) and *Cohen Tauber Spievak & Wagner, LLP v. Alnwick*, 825 N.Y.S.2d 439 (App. Div. 2006)). Indeed, in his affirmation in support of his motion, Harris applies "[s]ome of" the *Winkfield* factors as they pertain to his service to DeCastro in this case. (Docket No. 392, at 5-7). Accordingly, the Court finds that it is appropriate to compute Harris's lien on a *quantum meruit* basis. *See Kovach*, 2015 WL 3540798, at *4.

Yet a significant factor in the *quantum meruit* analysis is "the time reasonably expended on" the services rendered. *Sequa*, 156 F.3d at 148. And similarly, in ultimately setting the amount of the Section 475 charging lien, courts often use the lodestar method, in which "the hours reasonably spent by counsel, as determined by the Court, [are] multiplied by the

reasonable hourly rate." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987) (alteration in original) (internal quotation marks omitted). Harris has made this determination impossible by failing to adequately document the work he performed for DeCastro in this case, including the time he spent on this matter prior to, and throughout, the trial. All Harris has submitted as documentation in support of his charging lien are his retainer agreement; several of his bills to DeCastro, which for the most part reflect the flat fee set forth in Harris's retainer agreement; a bill from an attorney in India who researched Kavadia's connection to a company in India; and a retainer agreement with a bankruptcy attorney in New Jersey who assisted in DeCastro's motion to lift the bankruptcy stay with respect to the fourteen diamonds. (Docket No. 392, Exs. 1-4). Absent evidence of the hours Harris spent on this case, the Court is simply unable to apply the *quantum meruit* factors and to calculate the amount of the charging lien.

The Court is not convinced that Harris has earned another chance to prove up the amount of his charging lien, particularly given that the Court expressly directed Harris to brief the *Winkfield* factors, which include "time reasonably expended" by counsel. *Winkfield*, 2013 WL 371673, at *2. Yet in light of the legislative policy in favor of charging liens set forth in Section 475, the Court will grant Harris one last opportunity to document his services in this matter. Accordingly, it is hereby ORDERED that, no later than two weeks from the date of this Opinion and Order, Harris shall file a submission detailing the amount to which he is entitled based on the fair and reasonable value of his services. This submission must be accompanied by detailed documentation of his work on this case prior to, and throughout, the trial, including descriptions of the work performed and the time expended. *See F.H. Krear*, 810 F.2d at 1265 ("The burden is on counsel to keep and present records from which the court may determine the nature of the

work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested."); *Gen. Star Indem. Co. v. Custom Editions Upholstery Corp.*, 940 F. Supp. 645, 653 (S.D.N.Y. 1996) (noting that even under the liberal New York rule allowing use of reconstructed records in calculating attorneys' fees, "speculative" records are impermissible). No later than four weeks from the date of this Opinion and Order, any remaining party may file a response in opposition to Harris's submission. No reply is permitted absent prior leave of Court.

## CONCLUSION

For the foregoing reasons, the Court grants Harris's motion to enforce the attorney's charging lien. Further, no later than two weeks from the date of this Opinion and Order, Harris shall file a submission detailing the amount to which he is entitled based on the fair and reasonable value of his services, along with detailed time records in support of his submission. Any opposition to Harris's submission shall be filed within four weeks from the date of this Opinion and Order. The Court will reserve judgment on the amount of the lien pending those submissions. The Clerk of Court is directed to terminate Docket No. 391.

SO ORDERED.

Date: October 3, 2018
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

19